IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

ROGER WILLIAMS,                    *

    Plaintiff,                    *

vs.                                *

                                   CASE NO. 3:23-CV-92 (CDL)

UNIFIED GOVERNMENT OF ATHENS-      *
CLARKE COUNTY, GEORGIA,

                                      *

    Defendant.                    *

_____    *

## O R D E R

Roger Williams was a police officer with the Athens-Clarke County police department until he was terminated on May 4, 2022. Williams, who is black, claims that race was a motivating factor in his termination, and he brought a claim against The United Government of Athens-Clarke County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m). Presently pending before the Court is Defendant's summary judgment motion. As discussed below, Williams did not present sufficient evidence to create a genuine factual dispute as to whether race was a motivating factor in his termination. Therefore, the Court grants the summary judgment motion (ECF No. 18).

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Williams, the record reveals the following facts.

Roger Williams, who is black, worked as a police officer for Athens-Clarke County ("ACC") from March 12, 2018 until May 4, 2022. He received training on ACC's use of force policy and rules of conduct.  ACC's use of force policy permits "less-lethal and non-lethal force . . . when employees only use the force necessary to accomplish lawful objectives."  Cruz Decl. Ex. B, Use of Force Policy § 6.01.05.A, ECF No. 18-7 at 16 ("Force Policy").  The officer should determine what level of force to use "based on the resistance by the person and weapons possessed by the person." *Id.*  An officer "must always hold a position of advantage over resistive persons but should escalate or de-escalate the use of force in response to the actions of the other person(s)."  *Id.*

Officers are required to use "de-escalation steps to avoid and/or reduce the level of force necessary and shall give verbal warnings prior to using lethal, less-lethal, and/or non-lethal force"—except "in cases where time, circumstances, and/or safety considerations reasonably dictate otherwise." *Id.* § 6.01.05.C, ECF No. 18-7 at 16.  ACC's custody policy provides that an officer "will not leave any arrestee unattended or without direct supervision and care."  Cruz Decl. Ex. C, Rules of Conduct § 1.04.03.Q, ECF No. 18-7 at 35.  It is undisputed that ACC's policies allow for discipline, including termination, based on violations of these policies.

## I.    The October 17, 2021 Use-of-force Incident

ACC asserts that it terminated Williams because of a use-of-force incident that happened on October 17, 2021.  The facts regarding that incident are largely undisputed, and there is audio and video footage of the incident from Williams's body camera and another officer's body camera.  Williams and two other officers responded to a domestic disturbance call.  Liana Beam answered the door and said she was fine.  Williams asked if the man inside could come out to confirm that he was fine, too.  Beam said no, and she refused to allow the officers to enter the home to check on the man who was inside.  The officers explained that they were required to check on the man.  After some back and forth, Williams stated that he was done talking.  Williams removed Beam from the front

door and noticed that she smelled of alcohol. Beam yelled at the officers that it was not okay for them to go inside her house. Beam shouted at Williams, asking why she was being held, and Williams told her to stop or she would get "slammed on the ground." Def.'s Mot. Summ. J. Ex. 8, Williams Body Camera 02:18-02:23.[1] Williams tried to handcuff Beam, but she pulled away, fell, hit the side of the house, and landed face down in a shrub. Williams helped Beam get up, finished handcuffing her, explained that she was going to jail for obstruction, and walked her down the driveway toward his patrol car that was parked on the street. Beam yelled the entire way, asking Williams why he was doing this and telling him not to put her in the police car. Williams repeated that Beam was going to jail for obstruction.

Beam refused to get in the police car. She tried to pull away from Williams. Williams forced Beam to the ground, her hands cuffed behind her back, and Beam struck her head on the pavement. Williams told Beam to get up. As Williams helped Beam get to her knees, Beam's speech was noticeably slurred. Then, Beam, whose hands were still cuffed behind her back, fell forward and hit her head again on the pavement. Williams did not block her fall, and Beam stayed face down on the pavement with Williams standing over her. At the time, Williams believed that Beam was unconscious.

---

[1] The body camera recording is on file with the Court.

After about twenty seconds, Beam began to speak and move.  Beam's regular speech pattern returned, and Beam continued shouting that she had not done anything wrong.  She also yelled at Williams to stop touching her.  Williams helped Beam to her feet and told her to get in the car or he would slam her on the ground again.

Williams ushered Beam to the patrol car as she continued yelling at him.  She sat on the back seat but refused to put her legs in the car.  She continued yelling at Williams, then stood up and tried to get around Williams to talk with bystanders who were observing the incident.  Williams told Beam that if she did not get in the car, he would slam her on the ground.  Williams forced Beam to the ground, and she struck her head on the pavement.  No body camera captured what actions Williams took to force Beam to the ground the final time, but another officer's body camera footage showed that Beam's feet came off the ground and her dress and hair flew up as she went down to the pavement.  Def.'s Mot. Summ. J. Ex. 9, Espinosa Body Camera 00:05-00:07.[2]  Just after the final takedown, Beam's boyfriend, who was being placed in a separate patrol car, asked Williams why he threw Beam down, and Williams said it was because Beam was pulling away from him. Williams tried to get Beam to stand up, but she was unresponsive and snoring.  Williams called for emergency medical services.  Beam

---

[2] The body camera recording is on file with the Court.

lay on the street for a couple of minutes while Williams explained his actions to a bystander.  Two other officers approached, told Williams that Beam needed to be put in the car, and helped Beam get into the patrol car.  EMS personnel later checked Beam and cleared her to be taken into custody.

After Beam was in the car, Williams told another officer that he had to slam her on the ground twice, though he later stated that he did not use significant force—he "guid[ed]" Beam to the ground and the force with which she struck the ground was because of Beam's momentum in pulling away from him.  Williams Dep. 122:10-22, ECF No. 20.  Williams told another officer that he was not worried about his safety during the incident but could not physically get Beam into the car on his own.  Williams's supervisor, Sgt. Caleb Emmett, responded to the scene of the incident and briefly spoke with Beam about why she was arrested, but he did not interview Beam about the use of force.

## II.  The Investigation of the October 17, 2021 Incident

ACC's policy requires the officer to report all use-of-force incidents.  Force Policy § 6.01.08.A, ECF No. 18-7 at 21.  The officer's commander is supposed to review any body camera footage within forty-eight hours of the incident and notify the police department's Office of Professional Standards ("OPS") if there was a policy violation or circumstances likely to draw public attention.  *Id.* § 6.01.08.C, ECF No. 18-7 at 23-24.  The officer's

supervisor must investigate the incident and send an investigation memorandum "through the employee's chain of command" within forty-five days of the use of force. *Id.* § 6.01.08.B, ECF No. 18-7 at 22. Under the policy, the investigation memorandum should be "sent through channels to the Chief of Police." *Id.* In addition, the policy states that OPS must review use of force reports, forward them to the police chief, and ensure that use of force reports are properly maintained. *Id.* § 6.01.08.D, ECF No. 18-7 at 24. If the police chief or deputy chief initiates an administrative investigation, then OPS conducts one.[3] In practice, not all use of force reports get escalated to the police chief; if "people lower in the food chain," including lieutenants, captains, and the deputy chief, do not see something "egregious or excessive," the report does not get escalated to the chief. Saulters Dep. 46:5-47:6, ECF No. 31.

Williams entered a use of force report shortly after the October 17, 2021 incident. He noted that he "had to take Beam to the ground" twice because she kept trying to pull away from him.

---

[3] In officer-involved shooting cases, ACC policy requires OPS to conduct an administrative investigation; in other cases, an OPS investigation is at the discretion of the chief or deputy chief. Before the events giving rise to this action, Williams was the subject of two OPS administrative investigations of officer-involved shootings. In one case, Williams discharged his firearm at a suspect who was swinging a machete at him. In the other case, Williams and several other officers discharged their firearms at a suspect who was pointing a gun at them. OPS determined that in both cases, Williams used objectively reasonable force and acted within ACC policy. Then-Chief Cleveland Spruill agreed.

Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. B, Use of Force Report 1, ECF No. 32-2 ("Force Report").  Emmett spoke to Williams about the incident shortly after it happened, but he did not review the body camera footage or forward Williams's report to his commander until nearly two months later, in December 2021.  *Id.* at 4; *accord* Davidson Dep. 81:3-82:8, ECF No. 28.  The commander, Lt. Jody Thompson, did not review the body camera footage until more than two months after the incident.  Davidson Dep. 102:1-5.[4]

Emmett forwarded Williams's report to Thompson, acknowledging that it was late and stating that he still needed to work on a use of force memorandum.  After Thompson received the report from Emmett and accessed the body camera footage, Thompson added comments to the report, highlighting several "issues" with the incident that "need[ed] to be addressed."  *Id.* at 5.  He noted that Williams did not ask Beam about the underlying domestic dispute for which police were called, opined that "more verbal techniques" were needed at the beginning of Williams's encounter with Beam, suggested that de-escalation techniques should have been used after Beam was removed from the doorway, and commented that the level of force Williams used to remove Beam from the

---

[4] Williams notes that a colleague on his shift discussed one of the body camera videos with a training officer who opined that he did not see any policy violations based on his review of the one video.  Williams did not point to any evidence that the training officer was part of the chain of command that reviewed both videos and all the other evidence regarding the incident or that he discussed the incident with anyone in Williams's chain of command.

doorway at the beginning of the encounter escalated the situation. *Id.* Thompson also observed that the situation "spiral[ed] out of control" and that Beam pulled away from Williams several times, but he did not describe Beam's conduct in further detail. *Id.* Thompson did comment that Williams "allowed" Beam to pull away from him and "appear[ed] to take her to the ground which result[ed] in [Beam] slamming her head into the asphalt, rendering her unconscious" in front of witnesses. *Id.* at 5. Thompson did not recommend immediate administrative leave. Saulters Dep. 68:25-69:7. Thompson also did not opine that Williams committed any policy violations, he did not recommend discipline, and he did not notify OPS about the matter. Force Report 5.

Thompson forwarded the use of force report, including his comments, to Captain Derek Scott. Force Report 4-5. Scott requested a use of force memorandum, and Thompson relayed the message to Emmett. *Id.* Emmett submitted a use of force memorandum to Scott. *Id.* at 6. Scott commented, "After reviewing the Memo and the videos of this case, I find clear policy violations." Force Report 6. Scott recommended that the use of force be reviewed by OPS.

Scott forwarded the use of force report, including Emmett's use of force memorandum, to Deputy Chief Keith Kelley. Kelley reviewed the report and the body camera footage. He was concerned that Williams's actions violated ACC's use of force policy. On

January 20, 2022, Kelley directed OPS Sgt. Paul Davidson to begin an administrative investigation. Kelley Decl. ¶ 6. Williams asserts "that it was Thompson's description of Williams'[s] conduct that triggered" Kelley's "concerns that the arrest of Beam might have violated department policy" and led Kelley to order the OPS investigation. Pl.'s Resp. Br. To Def.'s Mot. Summ. J. 16, ECF No. 32-1 ("Resp. Br."). But that is not what Kelley said. Kelley stated that he "reviewed the Use of Force Report and the accompanying footage from Williams'[s] body-worn camera" and "was concerned, based on the content of [the] Use of Force Report and the [body camera] footage, that Williams had violated ACC[] policy." Kelley Decl. ¶ 5. Kelley acknowledges that he saw Thompson's "comments in the Use of Force report," but he did not state that it was that portion of the report that triggered his decision, and he did not discuss the incident with Thompson. By the time the report got to Kelley through the chain of command as required by ACC policy, it included Emmett's use of force memorandum and Scott's recommendation—based on his own review of Emmett's memorandum and the body camera footage—that an OPS investigation be ordered.

Davidson notified Williams of the OPS investigation on January 21, 2022. Davidson began the investigation by examining the body camera footage, reviewing the incident report and comments, visiting the scene of the incident, and interviewing

both ACC police witnesses and civilian witnesses.  Beam declined to be interviewed, but she sent Davidson three photographs of her injuries.  Davidson Dep. Ex. 2, Mem. from P. Davidson to J. Saulters at ACCGOV-000746 (Mar. 18, 2022), ECF No. 35-2.

On March 8, 2022, Kelley brought the use of force report and the body camera footage to the attention of then-Police Chief Cleveland Spruill.  The same day, Spruill placed Williams on restricted administrative duty status pending the outcome of the OPS investigation.  Soon after that, Spruill retired and Jerry Saulters became interim police chief.

Davidson completed his investigation memorandum on March 18, 2022 and sent it to Saulters.  Davidson concluded that the evidence did not support a finding that Williams used excessive force at the beginning of his interaction with Beam, when she fell against the side of the house, or later in the incident when she fell forward on her own.  *Id.* at ACCGOV-000763-764.  But Davidson did find that the evidence supported a conclusion that Williams twice "thrust Ms. Beam face-first into the asphalt while handcuffed and non-assaultive," which was "more force than was objectively reasonable to control Ms. Beam."  *Id.*  Davidson also found that the evidence supported a conclusion that Williams "ceased attempts to de-escalate the situation" after Beam's first fall despite ACC's policy requiring de-escalation.  *Id.* at ACCGOV-764.  Davidson further stated that the evidence supported a conclusion that

"Williams failed to monitor and care for Ms. Beam's physical safety" because he did not ask Beam if she was injured or try to render aid even when Beam "appeared [to be] unconscious in the middle of the street." *Id.* at ACCGOV-000765. Davidson also found faults with the actions of Williams's supervisors; he noted that Emmett did not adequately interview witnesses or investigate the scene, that neither Emmett nor Thompson reviewed the body camera footage in a timely manner, and that Emmett's investigation report was very late. *Id.* at ACCGOV-000761.

The decision of whether to discipline Williams was up to Saulters, subject to review by ACC's human resources department. Before he decided, Saulters reviewed Davidson's OPS investigation memorandum, watched the body camera footage "[p]robably 20 times," and went over the facts of the investigation with his six captains. Saulters Dep. 100:4-8. Saulters also sought feedback on the body camera footage from the chief and assistant chief of the University of Georgia police department. Finally, Saulters met with Williams. They watched the body camera footage together, and Saulters asked Williams if he would do anything differently. It is undisputed that Williams stood by his actions and stated that he would not treat Beam differently if he could do it over. After taking these steps, Saulters determined that Williams had violated ACC's use of force, de-escalation, and custody policies. Based on the information before him—including Williams's position that there

was nothing wrong with his actions—Saulters decided that the appropriate discipline for these violations was termination. Saulters recommended termination on April 27, 2022. Willams's termination became final on May 4, 2022.

DISCUSSION

Williams brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), asserting that his race was a motivating factor in the termination decision. ACC argues that Williams's claim fails because his charge of discrimination before the Equal Employment Opportunity Commission was untimely. ACC contends that even if Williams timely filed his charge of discrimination, he did not present enough evidence for a jury to find that his termination was unlawful under Title VII. The Court addresses each argument in turn.

## I. Was Williams's EEOC Charge Untimely?

Before filing a Title VII action in federal court, an employee must exhaust his administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258 (11th Cir. 2003) ("Because Georgia is a non-deferral state, [the employee] was required to file a Charge of Discrimination within 180 days of the alleged unlawful employment action."). The 180-

day clock runs from the date the employee receives notice that he "is actually being terminated." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 849 (11th Cir. 2000).

Here, it is undisputed that ACC officially terminated Williams on May 4, 2022, when the human resources department approved Saulters's termination decision. Williams filed his charge of discrimination with the EEOC 181 days later, on November 1, 2022. But genuine fact disputes exist on when ACC *notified* Williams of the final termination decision: Williams testified that he did not receive notice of the final termination decision until May 5, 2022. Williams Dep. 252:15-24, ECF No. 20. And, an ACC human resources representative sent Williams a final termination letter dated May 6, 2022. Welch Decl. Ex. A, Letter from L. Welch to R. Williams (May 6, 2022), ECF No. 18-6 at 5. Under these circumstances, a reasonable factfinder could conclude that Williams did not receive a final notice of termination until May 5, 2022 or later. He filed his charge of discrimination within 180 days of May 5, 2022. Accordingly, ACC did not establish, as a matter of law, that Williams's EEOC charge was untimely, and the summary judgment motion on this ground is denied.

## II.  Did Williams Show that Race was a Motivating Factor in his Termination?

Title VII makes it unlawful for an employer to terminate an employee "because of" his race. 42 U.S.C. § 2000e-2(a)(1). An

unlawful employment practice is established under Title VII "when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m). The Court must determine whether Williams offered enough evidence from which a reasonable jury could conclude that his race was a motivating factor for his termination. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1240 (11th Cir. 2016). To survive summary judgment, Williams must point to evidence from "which a reasonable jury could conclude that race at least 'played a role' in" his termination, even if legitimate factors also motivated the termination. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1343 (11th Cir. 2023) (per curiam) (quoting *Quigg*, 814 F.3d at 1241). Simple enough. But in the words of the inimitable Lee Corso, "not so fast."[5] Some brief background on the various Title VII analytical approaches is appropriate before analyzing the specific facts in this case.

The determination of whether an employer violated Title VII in its termination of an employee has arguably become unnecessarily complicated. Title VII prohibits an employer from firing an employee because of his race; it also prohibits an employer from

---

[5] Lee Corso, a former college football coach, has been an analyst on ESPN's College Gameday program since its inception in 1987. At age 87, he has become a beloved figure and a fixture on college football Saturdays. Perhaps best known for donning the mascot headgear of the team he predicts will win in that week's featured matchup, he also is known by his catchphrase response to other analysts on the program with whom he disagrees on a prediction--"not so fast, my friend."

considering race as a motivating factor when it terminates an employee, even if it would have fired the employee without any consideration of race.[6]    The courts have developed various analytical frameworks for analyzing whether summary judgment is appropriate in these cases depending on whether the employee's evidence is direct or circumstantial and whether the claim is a single-motive or mixed-motive claim. *See Quigg*, 814 F.3d at 1235-38 (explaining the difference between single-motive and mixed-motive circumstantial evidence claims).    For a circumstantial evidence, single-motive claim, the courts have traditionally relied on the well-recognized *McDonnell Douglas* analytical framework as supplemented by what has been described as a "convincing mosaic" circumstantial evidence test, which are "two ways to approach the same question: whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred." *McCreight v. AuburnBank*, No. 22-12577, 2024 WL 4232440, at *9 (11th Cir. Sept. 19, 2024) (observing that "the pretext prong of *McDonnell Douglas* is just

---

[6] These aspects of Title VII have developed their own nomenclature.  If an employee claims that race was the sole factor in his termination, such a claim is a "single-motive" claim.  If the employee claims that the employer acted with both unlawful and permissible motives, such a claim is described as a "mixed-motive" claim.  If an employer defends a mixed-motive claim by contending that it would have made the same decision even if it had not considered an impermissible motive, that defense has been labeled the "same decision defense."  If an employer prevails on the "same decision defense," the employee cannot recover compensatory damages but may be entitled to injunctive relief.

the ordinary summary judgment standard," as is the convincing mosaic approach).  For circumstantial evidence mixed-motive claims, the standard is simply the Rule 56 standard: "whether the employee has offered enough 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.* at *7 (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023)).

Rather than getting bogged down in all these different judge-made analytical frameworks with their judge-made labels, it seems more straightforward here to simply determine whether there is sufficient evidence from which a reasonable jury could conclude that race had anything to do with Williams's firing.  If there is not, ACC is entitled to summary judgment whether Williams frames his claim as single-motive or mixed-motive and whether the test is some derivation of *McDonnell Douglas* or amounts to a "convincing mosaic."  *See Tynes*, 88 F.4th at 949 (Newsom, J., concurring) ("*McDonnell Douglas*, it now seems to me, not only lacks any real footing in the text of Rule 56 but, worse, actually obscures the answer to the only question that matters at summary judgment: Has the plaintiff shown a 'genuine dispute as to any material fact'— in the typical Title VII case, as to whether her employer engaged in discrimination based on a protected characteristic.").  The bottom line:  if there is insufficient evidence to create a genuine factual dispute on whether race played any role in ACC's

termination decision, then Williams cannot prevail on a Title VII claim.

Williams contends that two types of evidence show that his race was a motivating factor for his termination. First, Williams contends that his commander, Thompson, harbored a racial bias against black people and improperly influenced the investigation. Second, Williams asserts that white officers involved in use-of-force incidents were treated more favorably than he was. The Court examines both arguments to determine whether genuine fact disputes exist on Williams's Title VII claim.

A.   Is There Evidence that Thompson Improperly Influenced the Termination Decision?

An employee can establish that his race played a motivating factor in an employment decision if he can show that "discriminatory input," like racial bias, factored into the "decisional process." *Quigg*, 814 F.3d at 1241. In *Quigg*, for example, the Eleventh Circuit found a genuine fact dispute on whether the plaintiff's sex was a motivating factor for her termination because three of the five board members who voted not to renew the plaintiff's contract made statements indicating that they preferred men for the job. *Id.* at 1241-42. Here, Williams acknowledges that Saulters, not Thompson, was the decisionmaker and that he conducted an independent investigation of the facts.

It is undisputed that Saulters did not consult Thompson at all during his investigation.

Conceding that he has no evidence that Saulters himself had a racial bias, Williams argues that Thompson had a bias against black people and improperly influenced Saulters's decision to terminate him. Williams is correct that an employee may show that his race was a motivating factor in his termination if he presents evidence that a biased supervisor manipulated the ultimate decisionmaker to follow the supervisor's biased recommendation without independently investigating the underlying facts. *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023); *accord Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (explaining "cat's paw liability" in the context of a case under another statute with a "motivating factor" causation standard). So, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action," then the employee's protected trait may be considered a motivating factor for the action. *Staub*, 562 U.S. at 422.

The Court is not convinced that Williams presented evidence that his race motivated Thompson's conduct. Although a jury could conclude that Thompson made inappropriate remarks about other black ACC officials, Williams did not point to evidence that

19

Thompson made any racial remarks about Williams or the use-of-force incident. If "an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine" fact dispute that the employer actually considered the protected trait in taking the challenged action. *Quigg*, 814 F.3d at 1241. Williams did not point to any evidence connecting Thompson's remarks about other ACC officials to the particular employment decision at issue here.

Even if Williams had pointed to evidence that Thompson, *motivated by* racial bias, *intended* for Williams to be subjected to an adverse employment action, Williams did not present enough evidence to create a genuine fact dispute on proximate cause. Again, Thompson did not recommend a specific employment action, notify OPS of the incident, or opine that Williams violated ACC policies. Williams concedes that Saulters conducted his own independent investigation of the facts after Davidson completed the OPS investigation. Williams did not point to evidence that Davidson relied on false facts supplied by Thompson when he prepared the OPS report. Nor did he point to evidence that Saulters relied on false facts supplied by Thompson. Rather, the record shows that Saulters reviewed the OPS investigation report, watched the body camera footage at least twenty times, sought counsel from eight other law enforcement supervisors, and

discussed the incident with Williams.  In summary, the record does not show that Thompson manipulated Saulters to fire Williams.

Perhaps recognizing these deficiencies, Williams argues that race was a motivating factor in the termination decision because some of Thompson's comments on the use of force report were overly critical and might have triggered the OPS investigation.  The Court is not convinced that the proximate cause chain extends so far. And, Williams did not point to evidence that a false narrative by Thompson triggered the OPS investigation.  Rather, the present record shows that at each step of the chain of command above Thompson, the supervisors reviewed the body camera footage, the use of force report, and Emmett's use of force memorandum.  As Williams acknowledges, although Davidson discounted Thompson's opinion regarding Williams's initial use of force against Beam, he largely validated Thompson's opinion that there were issues regarding Williams's conduct, particularly that Williams failed to use de-escalation techniques and then twice used more force than was objectively reasonable when he forced Beam to the ground.  In summary, Williams did not point to evidence that either the OPS investigation or Saulters's investigation was tainted by biased input from Thompson.  Under these circumstances, Williams cannot establish that his race was a motivating factor in his termination based on Thompson's conduct.

B.  Is There Other Evidence that Williams's Termination was
Motivated by Race?

Williams asserts that even if he cannot prove his claim by
relying on Thompson's conduct, he can still show that race was a
motivating factor in his termination.  To survive summary judgment,
Williams must present "enough evidence for a reasonable factfinder
to infer intentional discrimination in an employment action."
*Tynes*, 88 F.4th at 946.  To meet that burden, a plaintiff may point
to evidence that the employer treated a similarly situated employee
more favorably—even one who is not similarly situated in all
material respects.  *Id.*  The plaintiff may also demonstrate
"systematically better treatment of similarly situated employees."
*Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

Here, Williams asserts that he was treated less favorably
than white officers who used force and that it is possible that
ACC "was systematically less aggressive about punishing white
officers" involved in use-of-force incidents.  Pl.'s Resp. to Mot.
Summ. J. 23, ECF No. 32-1.  In support of these arguments, Williams
pointed to the following evidence.  Between 2019 and 2023, ACC
only terminated one officer and cited excessive force as the
reason.  That officer was Williams.  ACC officers reported
approximately 200 use-of-force incidents per year, ranging from
shows of force and weaponless physical control techniques to lethal
force.  More than 100 officers reported that they were involved in

at least two use-of-force incidents in a year, and fourteen officers reported that they were involved in more than ten use-of-force incidents in a year. Most of the officers involved in use-of-force incidents were white, while most of the targets were black. Based on this evidence, Williams argues that "a jury could reasonably wonder if Williams was genuinely the most egregious violator of the force policies over a five year stretch." *Id.* Such speculation is not enough; Williams must point to evidence from which a jury can infer intentional discrimination.

Williams pointed to a single incident which he contends shows that ACC was less aggressive about punishing white officers for using force. In that incident, a white officer "tased somebody that was running" on concrete, and the person suffered severe injuries. Wexel Dep. 78:1-5, ECF No. 21. ACC found that the use of force was within policy, but Williams contends that the officer violated ACC policy. In support of this contention, Williams relies on the testimony of Officer Sarah Wexel. Wexel believes that ACC policy "says to try not to tase people on concrete; but, you know, sometimes there's no other way around it. You have to." *Id.* at 78:6-8. Wexel testified that she did not "think that was a bad use of force" but "was a good one," although she noted that using a taser is "a lot more severe [than] just putting somebody on the ground." *Id.* Williams did not cite other evidence regarding the incident, such as why the officer used the taser in

the first place. Obviously, an officer's use of force on one suspect might be reasonable under the specific circumstances the officer faced, while such force (or lesser force) might be unreasonable against another suspect under different circumstances.[7]

The present record does not show that the white officer in the taser incident violated ACC's force policy, which means that the officer was not similarly situated to Williams. Williams is correct that he does not need evidence of a comparator who is similarly situated to him in all material respects, but to create a genuine fact dispute based on comparator evidence, he must point to enough similarities to create an inference of racial discrimination. So, if Williams could identify a white officer who used excessive (or arguably excessive) force under the circumstances he faced but was not punished, such evidence could be probative of discriminatory intent. *See Lewis*, 934 F.3d at 1187–88 (finding that evidence created an inference of racial discrimination where white officers failed physical fitness tests but received significant administrative leave to cure the deficiencies before being terminated, but a black officer who failed the test was immediately fired without warning). Williams,

---

[7] Williams himself used deadly force against two different suspects. His chain of command concluded that such force did not violate ACC policy because the suspects were threatening Williams and others with serious bodily harm, so Williams's use of force was reasonable under those circumstances.

though, did not point to evidence that any other officer violated (or arguably violated) ACC's use of force policy but was treated more favorably than he was, so he has not created an inference of racial discrimination through comparator evidence.[8]

Williams's final argument appears to be that he did not use excessive force against Beam. He contends that the evidence his supervisors relied on to find excessive force was "inconclusive" because the body camera footage did not show where Williams's hands were at "the instant where Beam falls to the ground." Resp. Br. 23. He summarily argues that the supervisors got it wrong and should not have concluded that he violated ACC policies. Title VII prohibits employers from discriminating against employees because of their race, but it does not prohibit an employer from firing an employee for good reasons, bad reasons, or reasons based on factual mistakes—"as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *accord Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that if an employer fires an employee because the employer honestly but mistakenly believes that the employee violated the employer's policy, evidence of the mistake does not show intentional

---

[8] Williams's failure to point to evidence of a similarly situated comparator would have likewise doomed his claim under the stricter *McDonnell Douglas* burden-shifting framework.

discrimination).   Here, Williams did not point to evidence to dispute that Saulters honestly believed Williams used excessive force on Beam and violated ACC policies, and he did not point to evidence that his race factored into Saulters's conclusion.

For all these reasons, the Court finds that Williams did not present enough evidence for a reasonable juror to infer intentional discrimination motivated his termination.   His Title VII claim thus fails.

CONCLUSION

Because Williams did not present sufficient evidence from which a reasonable jury could conclude that his race was a motivating factor in his termination, the Court grants ACC's summary judgment motion (ECF No. 18).

IT IS SO ORDERED, this 1st day of October, 2024.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA